# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 99-3122

_____

United States of America; United States    *
of America, ex rel Robert J. Norbeck,    *
   *
       Plaintiffs-Appellees,    *
   *   Appeals from the United States
     v.    *   District Court for the
   *   District of North Dakota.
Basin Electric Power Cooperative,    *
   *
       Defendant-Appellant.    *

_____

No. 99-3216

_____

United States of America,    *
   *
       Plaintiff,    *
   *
United States of America, ex rel    *
Robert J. Norbeck,    *
   *
       Plaintiff-Appellant,    *
   *
     v.    *
   *
Basin Electric Power Cooperative,    *
   *
       Defendant-Appellant.    *

_____

-1-

No. 99-3450
_____

| | |
|---|---|
| United States of America, | * |
| | * |
| Plaintiff-Appellant, | * |
| | * |
| United States of America, ex rel | * |
| Robert J. Norbeck, | * |
| | * |
| Plaintiff, | * |
| | * |
| v. | * |
| | * |
| Basin Electric Power Cooperative, | * |
| | * |
| Defendant-Appellant. | * |

_____

Submitted:  October 18, 2000

Filed:   April 30, 2001 (corrected 5-15-01)
_____

Before WOLLMAN, Chief Judge, LAY and BEAM, Circuit Judges.
_____

LAY, Circuit Judge.

## PART I. INTRODUCTION

Basin Electric Power Cooperative ("Basin"), located in North Dakota, was organized to build power plants and provide power for its members.  In the late 1970s and early 1980s, Basin constructed the Antelope Valley Station ("AVS facility") in North Dakota, which is the subject of this litigation.  The AVS facility includes three

separate parts: two power stations ("AVS I" and "AVS II"), and a set of common facilities designed to provide service to both AVS I and AVS II.

This litigation stems from a contract (the "Basin-WAPA contract") between Basin and Western Area Power Administration ("WAPA")[1]. During the course of building the AVS facility, Basin realized that the AVS facility would generate more power than its members demanded, so Basin needed to sell this excess power to keep the price of power from the AVS facility at a reasonable rate. At the same time, WAPA needed extra power to meet the demands of its customers. In 1982, WAPA contracted to buy 185 mega-watts ("MW") of the 450 MW capacity of AVS II. When the parties executed the contract, they could not accurately predict the price of power for the life of the contract. Accordingly, they agreed that WAPA's price would be based on the cost of power production. The contract provided that WAPA would pay 185/450th, or forty-one percent, of the cost of producing power at AVS II.

The methodology Basin used for determining the cost of AVS II power was set out in Exhibit A of the contract. Exhibit A listed a series of fixed and variable or energy related costs associated with producing power at the AVS facility, such as interest on debt, operation costs, steam expenses, and maintenance costs. The Rural Utilities Service ("RUS") promulgated the Rural Utilities Service System of Accounts ("RUS System") upon which these cost categories were based.[2] The RUS System incorporates Generally Accepted Accounting Principles ("GAAP"), a series of general principles followed by accountants. Included in GAAP are the Financial Accounting

[1]WAPA is a unit of the Department of Energy, which generates and distributes power to regional or local distribution utilities.

[2]The Basin-WAPA contract actually lists "REA Accounts." The REA, or Rural Electrification Administration, was the predecessor to RUS. RUS, and the REA before it, acted as the guarantor of Basin's debt, and oversaw many aspects of Basin's administration. We will refer to both these entities as the "RUS."

-3-

Standards ("FAS") published by the Financial Accounting Standards Board ("FASB").

However, before WAPA began purchasing power from AVS II, Basin sold AVS II to a consortium of corporate investors for a total of $622,875,000, and leased it back, paying a monthly lease cost instead of interest cost on AVS II debt. Consequently, the Basin-WAPA contract was modified to reflect that WAPA's cost of power would include a pro rata share of lease costs, rather than interest costs, for AVS II.

The contract was executed in 1982 and ran from 1985 to 1990 without any apparent problems. In 1992, Robert Norbeck ("Norbeck"), who worked as Basin's chief auditor during the Basin-WAPA contract, faced the prospect of losing his job. He sent a "whistle blower" letter to Basin's management, threatening to reveal several of Basin's allegedly fraudulent transactions unless he kept his job. Undeterred by the letter, Basin fired Norbeck,[3] who responded by bringing a qui tam action under the False Claims Act.[4] See 31 U.S.C. §§ 3729-3733. The Government eventually intervened, although it pursued only contract claims, as opposed to claims under the False Claims Act, against Basin. Norbeck, as the Relator, then pursued the false claims abandoned by the Government.

Broadly stated, the parties bring four issues on appeal. First, Basin appeals the district court's finding that Basin violated the False Claims Act with regard to the

_____

[3]Norbeck's discharge from Basin was the subject of a separate discrimination suit in which a jury awarded no damages to Norbeck. Norbeck appealed his case to this court, where the jury verdict was affirmed. See Norbeck v. Basin Elec. Power Coop., 215 F.3d 848 (8th Cir. 2000).

[4]The False Claims Act allows an individual (the Relator) to bring a qui tam claim -- a claim "in the name of the Government." 31 U.S.C. § 3730(b)(1). A Relator who brings a false claim that is ultimately successful can recover a percentage of the damages awarded. See id. at § 3730 (c)(1)-(2).

manner in which it accounted and billed for the sale/leaseback of AVS II.  Second, Basin appeals the district court's finding that Basin breached the Basin-WAPA contract by choosing a ten-year amortization period for the common facilities.  Next, on cross-appeal, Norbeck claims the district court erred when it found that Basin did not breach the Basin-WAPA contract by including post-construction imputed interest as a cost of power charged to WAPA.  Finally, the Government cross-appeals the district court's finding that Basin's calculation and billing for coal costs did not constitute a breach of contract.  We discuss these issues seriatim.

## PART II.  OVERCHARGE OF $15.5 MILLION VS. $2.4 MILLION

### A.  Background

Initially, Basin challenges the district court's finding that Basin overcharged WAPA due to Basin's sale and leaseback of AVS II.  Although Basin admits some overcharge occurred and returned approximately $2.4 million to WAPA before trial, the district court found that the total amount of Basin's overcharge was approximately $15.5 million.  In accord with this decision, the district court awarded WAPA slightly over $13 million ($15.5 million minus $2.4 million) in contract damages.  The district court further found that Basin  submitted these overcharges to WAPA in violation of the False Claims Act and multiplied the contract damages as provided for in the Act for a total judgment of $35.95 million.  On appeal, Basin asks that we reverse the district court's award, arguing that Norbeck[5] introduced no evidence to support the district court's judgment.  We agree,  and we reverse the district court's award of $13 million in contract damages, as well as the award of multiplied damages under the False Claims Act.

Like most large power facilities, the AVS facility was financed on debt.  Under

[5]The Government has not pursued this claim.

the original Basin-WAPA contract, WAPA's costs included a share of interest payments on AVS II. WAPA's costs also included a share of the interest from the common facilities. Since only a portion of the common facilities served AVS II, only a portion of common facilities' interest was allocated to AVS II, and only a pro rata share of that was passed on to WAPA.

After the formation of the original Basin-WAPA contract, Basin's new general manager discovered that it was in serious financial straits. To raise money to pay off debt, Basin sold AVS II to an outside group of investors and then leased it back, retaining full control over the operations of AVS II, but now paying a monthly lease. Since the original agreement made WAPA responsible for a share of AVS II interest, and the sale/leaseback of AVS II eliminated AVS II debt, Basin and WAPA altered their original agreement. Under the new agreement, WAPA became responsible for a share of AVS II lease payments in lieu of AVS II interest payments. The common facilities were not a part of the sale/leaseback of AVS II, so this amendment to the Basin-WAPA contract did not affect WAPA's responsibility for its share of common facilities' interest.

Basin, however, did not apply all of the money it received from the sale of AVS II to AVS project debt. Approximately $99.5 million went to pay off higher interest debt from other projects. WAPA's agreement to pay a share of AVS II lease costs as a substitute for AVS II interest costs meant that WAPA should not have been responsible for any interest from the unretired $99.5 million. Both parties agree that WAPA was charged for some of the interest from the $99.5 million. They disagree, however, on the amount of the overcharge.

To understand Basin's explanation for the overcharge on interest from the $99.5 million in unretired debt, a brief examination of Basin's accounting procedures is necessary. Basin did not keep separate pools of debt for each of the AVS facilities. Instead, all AVS debt was kept in a single pool. Since the cost of power from AVS I

and AVS II included interest on debt from the facility providing the power, as well as a portion of the interest from the common facilities, Basin needed to allocate the interest from this pooled debt to each of the AVS facilities. The interest was allocated based upon each facilities' proportionate net investment value (cost).

After the sale/leaseback transaction, WAPA was no longer responsible for any interest charges from AVS II, including interest from the $99.5 million in unretired AVS II debt. According to Basin, it eliminated AVS II interest as a cost category to WAPA, but properly continued to charge WAPA for its share of the common facilities' interest. The $99.5 million was still in the pooled AVS debt, however, and interest from the $99.5 million still accrued. When Basin allocated the pooled interest to AVS I and the common facilities (AVS II having been eliminated because of the sale/leaseback), a part of the interest from the $99.5 million was allocated to the common facilities. Then, once the common facilities' interest was allocated to AVS I and AVS II for the purposes of determining the cost of power, a portion of the interest from the unretired $99.5 million was allocated to AVS II. Thus, when Basin billed WAPA for common facilities' interest, the bill included a small portion of the interest from the unretired $99.5 million, for which Basin admits WAPA should not have been responsible.

Apparently no one complained about this overcharge during the contract period, and it was only when Norbeck threatened to "blow the whistle" on several of Basin's transactions that Basin took action.[6] After receiving Norbeck's "whistle blower" letter, Basin reviewed its bills to WAPA. Soon after, Basin informed WAPA that it had been

_____

[6]Based upon Norbeck's whistle blower letter, the district court believed that Norbeck was well aware of this overcharge. This is not the case. Norbeck's letter did refer to an audit done on a similar contract, but the letter does not indicate that Norbeck was aware of any overcharge. Indeed, Norbeck's brief admits that he was unaware of the outcome of the previous audit and that his letter merely questioned the conclusions of that audit.

overcharged an amount in excess of $1 million, and that Basin would shortly refund the money to WAPA.[7] Basin eventually sent WAPA approximately $2.4 million as payment for the overcharge (including interest), which WAPA accepted without complaint.

Several years after the $2.4 million refund, Norbeck was fired and proceeded with this False Claims Act complaint. The Government considered intervening and hired the accounting firm of KPMG to do an audit of the Basin-WAPA relationship. KPMG initially determined that Basin owed WAPA $13 million more than the $2.4 million Basin had already returned. KPMG arrived at this number by assuming that Basin kept separate pools of debt for AVS I, AVS II, and the common facilities. With that in mind, KPMG then assumed that the $99.5 million in unretired debt stayed in the AVS II account and that Basin continued to charge WAPA for its share of this remaining AVS II interest, in addition to the lease payments. Based upon these assumptions, KPMG determined that Basin overcharged WAPA in excess of $15 million, rather than the $2.4 million that Basin had already returned.

Once the KPMG audit was complete, Basin challenged KPMG's assumption that it maintained separate pools of debt for the AVS facility. KPMG investigated whether its assumption was correct, and the guarantor's of Basin's debt confirmed to KPMG that Basin kept all AVS debt in a single pool. Once KPMG learned this, it withdrew its conclusion that Basin owed WAPA in excess of $15 million.

Norbeck pursued the sale/leaseback issue, however, and the district court held in his favor. The district court's opinion relied exclusively upon the testimony of Lester

---

[7]The parties agree on the sequence of events, but disagree about the motivation. Basin claims it honestly undertook an audit of its transactions once it received the Norbeck letter and determined the amount of the overcharge in good faith. Norbeck claims that Basin fraudulently determined the amount of the overcharge, sending WAPA a lesser amount in the hopes that WAPA would not notice the real overcharge.

Heitger, an accounting professor who testified as an expert for Norbeck. Norbeck relies upon three arguments to support the district court's verdict.

First, Norbeck relies on the evidence admitted at trial showing Basin intentionally used $99.5 million of the proceeds from the sale of AVS II to pay off non-AVS debt. Norbeck consistently characterizes this as a misappropriation of funds, and believes the intentional use of this money to pay off non-AVS debt supports the district court's judgment.

Norbeck next relies on Heitger's review of the KPMG audit. Heitger testified that he reviewed the KPMG audit, and he believed that the KPMG audit correctly determined that Basin overcharged WAPA by $15.5 million. Heitger's review of the audit was limited, however, to checking KPMG's work; he did not conduct a new audit.

Norbeck's third argument relies on Heitger's "parallel construct," which Heitger referred to several times. (Trial Tr. of Lester Heitger at 136-37). Norbeck begins by pointing out that Basin received approximately $623 million from the sale of AVS II. Of that $623 million, Basin used $99.5 million to pay off non-AVS debt. Thus, approximately sixteen percent of the AVS II proceeds was, to use Norbeck's characterization, misappropriated. Norbeck then points out that WAPA paid $87.2 million in lease costs for AVS II during the contract period. Norbeck concludes that, had Basin not misappropriated the $99.5 million, WAPA's lease costs would have gone down by sixteen percent. Thus, sixteen percent of $87.2 million is a little over $13 million. When multiplied by a cost of money factor, this sum becomes close to the amount the district court found Basin overcharged WAPA.

On appeal, Basin argues that neither the district court nor Norbeck point to any competent evidence supporting the judgment. Further, Basin points out that it introduced its actual billing statements to WAPA, and Norbeck did not use those billing

statements to prove his case.[8]  Finally, although Norbeck has the burden of proof on his contract claims, Basin points out that it did introduce evidence, through the testimony of Ms. Shawn Deisz, an executive in Basin's accounting department, that supports Basin's description of how the overcharge took place.  Basin argues Deisz's testimony is the only direct evidence of the amount of the overcharge.

## B.  Amount of Overcharge

We believe the district court committed clear error in holding that Basin overcharged WAPA $15.5 million. Although the district court relied upon Heitger's expert testimony, which Norbeck contends should be sufficient to support the judgment, a close examination of Heitger's testimony reveals that neither of his arguments withstand scrutiny.  Also, Norbeck's attempts to characterize Basin's use of the $99.5 million as "misappropriation" misses the mark, and cannot support the judgment.

Norbeck's brief consistently attempts to characterize Basin's use of $99.5 million of AVS II proceeds on non-AVS debt as a misappropriation, suggesting that this misappropriation supports the judgment.  We find several flaws with this position. First, it appears to us that Basin's use of the $99.5 million was not inappropriate.  Basin was free to do what ever it wanted with the proceeds from AVS II, including spending that money on non-AVS debt.  Admittedly, Basin had an obligation to deal with the consequences of such a transaction correctly, and in this situation, it meant ensuring that WAPA would not be charged for interest from the unretired $99.5 million.  Basin admits as much.  This leads, however, to the second problem with Norbeck's argument. Simply saying that the $99.5 million was "misappropriated" does not provide any evidence of how much WAPA was overcharged.  Even if the $99.5 million was

---

[8]We note that Norbeck admitted at oral argument that an examination of Basin's bills to WAPA would not reveal an overcharge.

"misappropriated," that is not evidence of the actual amount of the overcharge to WAPA. Norbeck does not cite to any evidence, other than the abandoned KPMG audit, suggesting interest from the $99.5 million was directly allocated to AVS II (as the KPMG audit incorrectly assumed). Thus, this argument fails to support the amount of the judgment.

With respect to Heitger's analysis, he first testified that the amount of the judgment was supported by the KPMG initial audit.[9] This overlooks, however, the fact that the KPMG audit was based upon the faulty assumption that Basin separated each of the AVS facilities' debt. As the unrebutted testimony of Arvle Hix, an accountant with KPMG who worked on the Basin audit, shows, KPMG determined this assumption was incorrect, and later abandoned the conclusion in the initial draft that Basin overcharged WAPA $15.5 million.[10]

---

[9]Although Heitger relied upon the KPMG audit, he did not independently recalculate this audit. Rather, he testified that he "redid that [KPMG] calculation" and "concluded that it was an appropriate calculation." (Trial Tr. of Lester Heitger at 130).

[10]Q.    Okay. I neglected to ask you something I wanted to address. When you went back . . . and found out that the debt for AVS was pooled, were any of the claims or any of the issues in your audit report abandoned as a result of those consultations?

A.    Yes.

Q.    What issue or claim was abandoned as a result of that investigation?

A.    That first issue on the leveraged lease transaction.

Q.    Okay. And just so the record is clear on that, was that the issue about whether or not the refund that was ultimately made to WAPA should have been 2.4 million dollars or 13 million dollars?

-11-

Although Heitger checked KPMG's calculations to make sure they were correct, his testimony does not support the faulty assumption of separate debt upon which the entire KPMG audit was based. In fact, he specifically acknowledged that Basin pooled all of its debt. (Trial Tr. of Lester Heitger at 132-33). Since neither Heitger nor Norbeck have presented any evidence that suggests KPMG's initial (and later abandoned) assumption was correct, Heitger's support for the KPMG audit proves nothing. All Professor Heitger could correctly testify to was that *if* KPMG's assumptions were correct, *then* the KPMG figures were correct. However, he failed to provide any evidence that KPMG's assumption was, in fact, correct.[11] We believe, therefore, that Heitger's approval of the KPMG audit, when KPMG backed away from its own conclusions, cannot support the district court's judgment.

Professor Heitger's "parallel construct" argument fails for several reasons. First, the argument is based upon the assumption that Basin misappropriated the $99.5 million it spent on non-AVS debt. As we discussed earlier, Norbeck gives us no reason to believe the $99.5 million was misappropriated. Further, even if the money was misappropriated, Norbeck cannot show any connection between the misappropriation and WAPA's lease cost.[12] Basin and the outside investors negotiated the price of

_____

A.    Yes, I think so.

(Trial Tr. of Arvle Hix at 74).

[11]We further note that the district court specifically found that Basin's debt was in a single pool.

[12]Heitger even testified (seemingly contrary to his own "parallel construct") that the lease costs would not have been altered by the "correct" application of the $99.5 million:

Q:    (THE COURT) That cuts to the question: Would a lease amount have been lower in the cost factor to WAPA if the 99.5 million had been applied properly, under your terms? Would the lease payment have been

AVS II before it made any use, appropriate or inappropriate, of the funds. What Basin would do with the funds from the sale of AVS II did not affect the negotiations for the lease price of AVS II, which, of course, determined WAPA's lease costs. Therefore, the parallel construct argument fails since Norbeck can show no connection between Basin's use of the $99.5 million and WAPA's lease costs.

We find no evidence to support the district court's award of damages past the $2.4 million Basin already returned to WAPA. Norbeck has thus failed to meet his burden of proving Basin overcharged WAPA in excess of the $2.4 million, and accordingly, we reverse the district court's award of $13.05 million in contract damages.

### C. Multiplied Damages Under the False Claims Act

The district court found that Basin's overcharge of the interest from the $99.5 million was done with the level of intentionality required for multiplied damages under the False Claims Act. See 31 U.S.C. § 3729(a). Although we have reversed the district court's award over the $2.4 million Basin already returned to WAPA, we still must determine whether Basin overcharged the Government this $2.4 million with the level of intentionality required for the False Claims Act's multiplied damages

---

lower?

* * * *

A:    Well, answering the first question, is that the lease payment, itself, would probably not have been lower because they would have then all been properly applied.

(Trial Tr. of Lester Heitger at 137-38).

provisions.[13]

In order for Basin to be liable under the False Claims Act, it must have submitted the false claims with the requisite mental state.[14] The lowest level of intentionality that satisfies the False Claims Act is "act[ing] in reckless disregard of the truth or falsity of the information." See 31 U.S.C. § 3729(b)(3). "The improper interpretation . . . of a contract," however, "does not constitute a false claim for payment." United States ex rel. Butler v. Hughes Helicopters, Inc., 71 F.3d 321, 329 (9th Cir. 1995). Rather, something beyond mere negligence, but falling short of specific intent, must be shown for liability to attach. See United States v. Cooperative Grain & Supply Co., 476 F.2d 47, 60 (8th Cir. 1973) (holding False Claim Act intent standard was satisfied when defendant submitted his false claim in an "extremely careless and foolish" manner); JOHN T. BOESE, CIVIL FALSE CLAIMS AND QUI TAM ACTIONS § 2.04(c)(1) (2nd ed. 2000) ("To avoid summary judgment for the defendant [under the False Claims Act], admissible, credible evidence of a knowing false statement is required.").

The district court gave three reasons for its finding that Basin overcharged WAPA with the required intent. First, the district court held that Basin "knew that

_____

[13]The district court did not subject the $2.4 million Basin returned to WAPA before trial to the False Claims Act's multiplied damages provisions, apparently reasoning that since Basin voluntarily returned the money, it should not be subject to these provisions. Norbeck and the Government appeal this decision. If the district court was correct, then we would not have to decide whether the $2.4 million overcharge was submitted in violation of the False Claims Act, since the amount would not be subject to the False Claims Act's multiplied damages provisions. Since we find no evidence to support the district court's finding of fraud in the first place, we need not reach this issue.

[14]The False Claims Act, including the intent standard, was significantly modified in 1986. As this circuit recently indicated, the 1986 False Claims Act intent modification did not alter the law in the Eighth Circuit. See Miller v. Federal Emergency Management Agency, 57 F.3d 687, 690 (8th Cir. 1995).

-14-

interest on the remaining debt of the AVS [project] was being allocated in part as an expense item, in addition to the lease payments, in computing [WAPA's cost]." Despite this knowledge, "Basin Electric made a deliberate decision to retire other debt" with AVS II proceeds, which led to "a continuing overcharge" to WAPA. United States v. Basin Elec. Power Coop., No. A1-95-003 slip op. at 22 (D.N.D. Mar. 26, 1999). Second, the district court noted that once Norbeck sent his letter, the audit team investigating the overcharge "deliberately selected an assumption that the $99,500,000 payment did not have to be applied to that portion of the remaining debt being charged to WAPA, (AVS Unit II and 50% of the common area)." Id. at 23. Finally, the district court held that both these factors, "when linked to the myriad of small edges taken by Basin Electric" in determining costs under the contract "satisf[ies] the fraud requirement under the False Claims Act." Id. at 23. We believe each of these reasons lack merit.

First, Basin no doubt knew that interest on the remaining pooled AVS debt was being allocated, in part, to WAPA. This was entirely appropriate, since even after the sale and leaseback of AVS II, WAPA was still responsible for a share of the common facilities' interest. It is also uncontested that Basin "made a deliberate decision" to retire non-AVS debt with $99.5 million from the AVS II sale. Again, this was entirely appropriate, since Basin could do what ever it wanted with the proceeds from AVS II so long as it dealt with the consequences correctly. Finally, it is also uncontested that this decision indirectly led to a continuing overcharge to WAPA. Basin admitted as much when it returned the $2.4 million.

What is lacking from this analysis is any evidence that Basin knew, or acted in reckless disregard, of the possibility that any of the interest from this $99.5 million was actually charged to WAPA. The only intentional act the district court pointed to was the discharge of non-AVS debt, and Basin attempted to deal with the consequences of this act by eliminating interest from AVS II as a cost category in WAPA's bills. Nowhere does the district court or Norbeck point to any evidence that Basin knew that

interest from the $99.5 million was charged to WAPA through a back door, i.e., through interest payments from the common facilities.[15]

Second, the district court holds that the audit team reviewing the Basin-WAPA contract "deliberately selected an assumption" that the $99.5 million should be applied to the pooled AVS debt, rather than to only the "portion of the debt remaining being charged to WAPA." This, however, reflects the district court's misunderstanding of the situation, since Basin did not maintain separate pools of debt such that it could apply the $99.5 million directly to a certain portion of AVS debt. Had Basin used the $99.5 million to pay off AVS debt in the first place, it would have lowered AVS pooled debt -- including debt that was attributed to AVS I. It was entirely appropriate, therefore, for the audit team to assume, in determining the amount of the overcharge, that the *pooled* AVS debt would have been reduced by $99.5 million. If the audit team assumed the $99.5 million was somehow applied only to debt directly charged to WAPA, the result would be a refund greater than the original overcharge, since, as discussed above, only a small portion of the interest from the $99.5 million was ever charged to WAPA in the first place.

Even if the district court was correct that the $99.5 million should have somehow been applied directly to debt charged to WAPA, it provides no evidence that the audit team knew or acted in reckless disregard of the possibility that its assumption was incorrect. The audit team's deliberate choice of this assumption cannot be fraud if they honestly believed it was a correct assumption, and the district court does not point to any evidence suggesting that was the case.

---

[15]It appears that the district court's analysis is infected with the same error as Norbeck's argument: that Basin's decision to use $99.5 million of AVS II proceeds on non-AVS debt was somehow inappropriate. The correct question is whether Basin knew it was overcharging WAPA , not whether Basin knew it was paying off non-AVS debt. The district court did not point to any evidence of this.

Finally, the district court's reliance on the "small edges" taken by Basin in the various areas of cost computation cannot support its decision. The district court found that all of Basin's other overcharges were just "simple contract breaches." Id. at 24. But as we mentioned above, the mere misinterpretation of a contract cannot be the basis of a False Claims Act violation. All of these other "simple contract breaches," therefore, cannot provide evidence of a knowing violation of the Act.

Other than repeating the arguments of the district court, the only evidence Norbeck points to that could arguably support the finding of fraud are Basin documents discussing Basin's intent to use AVS II proceeds to pay off non-AVS debt. For example, Norbeck points to a September 25, 1985 internal memo that he claims demonstrates that Basin knew it was defrauding WAPA. But all this document does to support Norbeck's position is show that Basin intentionally used $99.5 million from the sale of AVS II to settle non-AVS debt. As we have mentioned several times, this decision was not inappropriate. These documents do not support the proposition that Basin dealt with the consequences of this decision fraudulently. They do not show that Basin knew that interest from the $99.5 million in unretired debt would get charged to WAPA through the common facilities. As with much of Norbeck's argument, he relies upon the alleged misapplication of the $99.5 million from the AVS II sale to support his argument, when such use of the money was not a misapplication in the first place.

We believe Norbeck failed to introduce evidence showing Basin overcharged WAPA beyond the $2.4 million Basin returned before trial. For this reason, we find the district court erred in determining that Basin overcharged WAPA more than this $2.4 million. We further believe that Norbeck has failed to provide any evidence that Basin submitted these payments with the reckless disregard for the truth necessary under the False Claims Act. We therefore reverse the district court's judgment against Basin on this issue.

# PART III.  TEN-YEAR VS. TWENTY-YEAR
# AMORTIZATION PERIOD

## A.  Background

Basin next appeals the district court's ruling that it breached the Basin-WAPA contract by choosing a ten-year amortization period for the AVS common facilities. Both Norbeck and the Government argue the district court correctly held Basin's ten-year amortization period breached the contract.  We agree with Basin and reverse the district court's award of damages.

Generating and Transmitting ("G & T") businesses, like Basin, make huge investments in plants and facilities.  G & T's need to recover these costs, but to attempt to recover their investment in the first few years of a plant's operation would lead to outrageous prices for consumers.  Therefore, G & T's commonly amortize these costs by spreading them into rates over a period of years.  This ensures that rates remain stable and that G & T's  recover their investment.

In line with this practice, Basin decided to amortize the costs of the common facilities into rates over a lengthy period.  Although Basin used a twenty-year  period for the common facilities at another power station (the Laramie River Station ("LRS") completed in the late 1970s), it chose a ten-year amortization  period for the AVS common facilities.  This ten-year period increased the amortization rate and raised prices to WAPA approximately $3.6 million over the life of the Basin-WAPA contract. The Government claims that Basin's choice of a ten-year amortization  period violated the implied covenant of good faith present in every contractual relationship.

The Basin-WAPA contract allowed Basin to amortize common facilities' investment into WAPA price rates.  No contractual provision required Basin to choose any  particular  amortization  period,  so  long  as  the  method  for  calculating  the

amortization rate was consistent with applicable RUS and GAAP rules. The Government does not contend that the choice of a ten-year period violated these rules. Instead, the Government argues Basin breached the implied covenant of good faith, pointing to the choice of a twenty-year amortization period for common facilities at the LRS station, an internal Basin memorandum suggesting a twenty-year amortization period was more in line with the useful life of the AVS common facilities, and Basin's switch to a twenty-year period shortly after the end of the Basin-WAPA contract.

While the Government relies on this evidence to argue Basin acted in bad faith, Basin tells a different story. According to Basin, its outside auditor, Coopers and Lybrand ("Coopers"), required it to choose a ten-year amortization period. Coopers apparently felt that Basin's twenty-year amortization period did not guarantee that Basin would recover its investment in the common facilities quickly enough. Basin admits that it switched to a twenty-year period shortly after the Basin-WAPA contract ended, but argues it did so only because Coopers finally agreed that a twenty-year period was appropriate for the AVS facility. The Government and Norbeck believe Basin's explanation is a smokescreen and assert that Basin chose the ten-year amortization period simply to raise prices to WAPA.

Apparently disturbed that Basin had used a twenty-year amortization period at the LRS project, and that Basin reverted to a twenty-year period for the AVS common facilities shortly after the Basin-WAPA contract expired, the district court found for WAPA, holding that "the requirement for consistency and uniformity [is] controlling." Basin, No. A1-95-003, slip op. at 11. The district court agreed that the discussions relating to a ten-year amortization period between Coopers and Basin took place, and further conceded that Basin wisely feared its outside auditors. See id. at 9. The district court believed that if Basin did not satisfy Coopers' concerns regarding the amortization rate, Coopers "would be forced to issue a 'qualified' opinion, which could have serious consequences to the business being audited." Id. at 8. The district court believed, however, that "no witness or testimony carries [the discussions between

Coopers and Basin] into the Manager's office or into the Board Room of the Cooperative."[16]  Id. at 9.

On appeal, the Government urges this court to affirm the district court's finding. Although the district court did not identify any specific legal ground for finding Basin breached the contract, and while no specific provision of the contract demanded that Basin choose any particular amortization period (as long as it complied with RUS rules), the Government believes that by choosing a ten-year period, Basin breached its implied duty of good faith and fair dealing.[17]

## B.  Analysis:  Good Faith and Consistency

We review the district court's legal conclusions, including the application of accounting principles, de novo.  See Hercules Inc. v. United States, 626 F.2d 832, 835 (Ct.Cl. 1980) ("the application of accounting rules to a finite problem raises an issue of contract interpretation, which is an issue of law.").  The application of the implied covenant of good faith is also an issue of contract interpretation that we review de novo.  See Taylor Equipment, Inc. v. John Deere Co., 98 F.3d 1028, 1031 (8th Cir. 1996).  Federal common law governs the interpretation and construction of a contract between the United States and another party.  See United States v. Applied Pharmacy

---

[16]The district court's finding that "no witness" carried Coopers' concerns into the manager's office is clearly erroneous.  Both Robert McPhail, the General Manager of Basin, and Howard Easton, the head of power marketing, testified that they wanted to use a twenty-year amortization period for the AVS common facilities, but were prevented from doing so by Coopers.  (Trial Tr. of Robert McPhail at 25-26; Trial Tr. of Howard Easton at 28-29, 50, 62-63).

[17]Norbeck also asks us to reverse the district court's finding that Basin did not submit these charges in violation of the False Claims Act.  Since we reverse the district court's finding that Basin committed a breach of contract, we have no need to discuss this issue.

Consultants, Inc., 182 F.3d 603, 604 (8th Cir. 1999); United States v. Tharp, 973 F.2d 619, 620 (8th Cir. 1992). When applying the "federal common law" of contracts, "that law must take into account the best in modern decision and discussion." Montana Power Co. v. United States, 8 Cl.Ct. 730, 735 (Cl.Ct. 1985).

The Government correctly urges every contract implies that each party will act in good faith. See Restatement (Second) of Contracts, § 205 (1981) ("Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement."). Courts must be careful when considering good faith, however, as it does not imply "an everflowing cornucopia of wished-for legal duties." Comprehensive Care Corp. v. RehabCare Corp., 98 F.3d 1063, 1066 (8th Cir. 1996). Nor should good faith be construed to "give rise to new obligations not otherwise contained in the contract's express terms." Id.

The good faith covenant does not impose a general requirement that a party act reasonably. Rather, the covenant acts merely as a gap filler to deal with circumstances not contemplated by the parties at the time of contracting. Kham & Nate's Shoes No. 2, Inc. v. First Bank of Whiting, 908 F.2d 1351, 1357 (7th Cir. 1990) ("Good faith is a compact reference to an implied undertaking not to take opportunistic advantage in a way that could not have been contemplated at the time of [the contract's] drafting, and which therefore was not resolved explicitly by the parties.") (quotations omitted). Since good faith is merely a way of effectuating the parties intent in unforseen circumstances, the implied covenant has "nothing to do with the enforcement of terms actually negotiated" and cannot "block [the] use of terms that actually appear in the contract." Continental Bank, N.A. v. Everett, 964 F.2d 701, 705 (7th Cir. 1992).

The Basin-WAPA contract gave Basin broad authority to determine its costs, as long as the determination satisfied RUS and GAAP requirements. We think it clear that the good faith duty did not require Basin to choose a particular amortization period. As the Tenth Circuit explained in Big Horn Coal Co. v. Commonwealth Edison Co.,

852 F.2d 1259, 1267-68 (10th Cir. 1988):

> [I]t is possible to so draw a contract as to leave decisions absolutely to the uncontrolled discretion of one of the parties and in such a case the issue of good faith is irrelevant. . . . [in such case] the parties expressly contracted for the unconditional right and thus they cannot reasonably expect any special implied protection.

This conclusion is in accord with the purpose of the covenant to "protect the reasonable expectations of the parties by implying terms into agreement." Id. at 1267 (quotations omitted). Our review of other legal authorities convinces us that the Big Horn Coal approach is a sound one.

For example, in Barseback Kraft AB v. United States, 36 Fed. Cl. 691 (Fed. Cl. 1996), the court faced a remarkably similar dispute involving the implied duty and one party's authority to set prices. Two foreign utilities contracted with the United States Enrichment Corporation (USEC) for the sale of uranium enrichment services. The foreign utilities argued that the USEC breached its Uniform Commercial Code ("U.C.C.") duty of good faith by setting unreasonable prices. Although the court rejected the application of the U.C.C., it noted, referring to the common law duty of good faith, that "there are Federal Government contract/common law principles paralleling the U.C.C. that could provide similar protections to the plaintiffs." Id. at 705. The court nevertheless rejected the application of the common law duty of good faith because "the parties contracted for a pricing provision that provides the USEC with the discretion to set the price for contracts. Both parties were aware, and the contracts specifically allowed, that the USEC could unilaterally establish prices under the contracts." Id. at 706. Thus, where a contract gives broad discretion to set prices to one of the parties, the court held it was inappropriate to use the implied covenant to, in effect, rewrite the bargained-for terms of the contract by limiting the price-setting

party's discretion.[18]  See also Taylor, 98 F.3d at 1031-33 (holding implied covenant of good faith should not be used to rewrite a contract provision that gives broad discretion to one of the parties).[19]  Cf. Hubbard Chevrolet Co. v. General Motors Corp., 873 F.2d 873, 877-78 (5th Cir. 1989) (holding implied covenant had "no role to play" in a dispute over refusal to approve dealer's relocation because the contract gave the party discretion to reject relocation).

The present case falls within this line of cases.  The contract provided Basin with discretion to determine its costs, so long as such costs fell within applicable RUS and GAAP rules.  To use the good faith covenant to limit Basin's discretion to choose rates would require us to rewrite the contract and give WAPA benefits for which it did not bargain.  Beyond being unfair to Basin, "in commercial transactions, it does not in the end promote justice to seek strained interpretations in aid of those who do not protect

---

[18]The Barseback court identified a second ground for refusing to apply the good faith doctrine, which applies here as well.  The Barseback court was "unwilling to infer a good-faith limitation on the USEC's pricing discretion because the contracts already include[d] a significant, bargained-for limitation on the USEC's pricing discretion." Barseback Kraft AB, 36 Fed. Cl. at 706.  This limitation was a "ceiling price" on costs, determined by a formula that accounted for electrical prices and the purchasing power of the dollar.  This ceiling was a "significant limitation" on the USEC's authority to set prices for which the "plaintiffs bargained."  Id.  Likewise, Basin was limited in its authority to set prices by applicable RUS and GAAP rules.  Just as the Barseback court, we are "unwilling to add protections beyond those significant contractual safeguards in place and for which the plaintiffs bargained."  Id.

[19]We should note that the Taylor case identified a second line of cases that provide a limited role for the implied covenant in discretionary situations.  Although the Taylor court appeared to prefer our approach, the facts of the case were such that the court did not need to decide which line of cases South Dakota courts would follow.  Under this second line of cases, the implied duty demands that the party with discretion act honestly when using that discretion.  See Taylor, 98 F.3d at 1033-34; Original Great Am. Chocolate Chip Cookie Co., Inc. v. River Valley Cookies, Ltd., 970 F.2d 273, 280 (7th Cir. 1992).

themselves." James Baird Co. v. Gimbel Bros., 64 F.2d 344, 346 (2d Cir. 1933) (L. Hand, J.).

The district court held that the requirement for consistency was controlling. The district court did not explain why consistency was controlling, but on appeal, Norbeck argues that consistency was required by GAAP.[20] We believe the district court erred as a matter of law, however, in applying the rule of consistency. Consistency is only one of many elements of GAAP and it should not be applied in a mechanical manner. See Thor Power Tool Co. v. C.I.R., 439 U.S. 522, 544 (1979) ("Generally accepted accounting principles, rather, tolerate a range of reasonable treatments, leaving the choice among alternatives to management.") (quotations omitted). The rule of Thor limits the district court, in reviewing an accountant's work, to deciding only whether the accountant chose a procedure from "the universe of generally accepted accounting principles." Godchaux v. Conveying Techniques, Inc., 846 F.2d 306, 315 (5th Cir. 1988). Further, the GAAP principles must be examined in relation to the type of business involved. See id.; Pittsburgh Coke & Chem. Co. v. Bollo, 560 F.2d 1089, 1092 (2d Cir. 1977). Thus, the district court's review was limited to determining whether the accounting principle of consistency *demanded* Basin treat the AVS and LRS common facility amortization rates consistently.

We believe the district court erred in applying consistency to this issue. As the Government's brief indicates, the accounting principle of consistency requires that *like* transactions be treated the same, and as the district court's findings indicate, the treatment of G & T amortization rates changed dramatically between the time the LRS

---

[20]The Government's brief mentions the principle of consistency, but does not argue that Basin violated GAAP rules, relying instead on the good faith covenant. In fact, one of the Government's witnesses testified that Basin's amortization rate did not violate GAAP. (Trial Tr. of Ned Christiansen at 163; see also Trial Tr. of Arvle Hix at 58-59). Norbeck alone argues that Basin's treatment violates GAAP, and he relies on the testimony of Heitger.

and AVS stations were complete.  See Basin, No. A1-95-003, slip op. at 8-9.  Because G & T's dramatically overbuilt capacity during the 1970s, there was a great concern that G & T's would be unable to recover up-front expenditures on projects like the AVS facility.  See id. at 8.  As a result, the FASB enacted FAS 71, which establishes the GAAP that amortization rates must be based upon a reasonable rate of recovery.  See id.  The lack of a specific time table, and continuing concerns about long amortization rates, caused the FASB to try to amend FAS 71 through the adoption of FAS 92.  FAS 92 sought to limit a new amortization period to a maximum of ten years.[21]  Id. at 8-9.

The Government and Norbeck argue that FAS 92 never bound Basin, but this argument misses the point.  FAS 71, FAS 92, and the continuing concern over amortization rates, show that the LRS facility and the AVS facility were not similarly situated.  Whether or not Basin was bound by FAS 92 does not alter the fact that Basin (and Coopers) had every reason to be concerned over a twenty-year amortization period.  For the district court to require that the AVS project and the LRS project be treated consistently turns the accounting principle of consistency into a wooden rule that is applied mechanically without taking into account changing circumstances and the range of reasonable alternatives available to accountants.  See  Thor, 439 U.S. at 544 ("Accountants long have recognized that generally accepted accounting principles are far from being a canonical set of rules that will ensure identical accounting treatment of identical transactions.") (quotations omitted).

Two sophisticated commercial entities, Basin and WAPA, entered into a contract that gave Basin discretion to set prices within RUS rules and GAAP.  Basin used a ten-year amortization period for the common facilities, which fully complied with these

---

[21]FAS 71 was adopted in 1982, after Basin began amortizing the LRS common facilities, but before Basin adopted the ten-year amortization period for the AVS common facilities.  FAS 92 was proposed and finally adopted several years later.

requirements, and set its prices accordingly. Since there is no question that Basin fully complied with the negotiated contract terms, we believe that the implied covenant of good faith should not be used to give WAPA more protection than for which they actually bargained.

For these reasons, we hold the district court erred in finding Basin breached its contract with WAPA by choosing a ten-year amortization period. We therefore reverse the district court's judgment against Basin relating to the ten-year amortization issue. In view of the fact that we find no breach of contract, Norbeck's appeal on the fraud issue, which the district court dismissed, is no longer a viable claim.

## PART IV.  IMPUTED INTEREST

### A.  Background

Norbeck on cross-appeal claims that Basin, with reckless indifference, breached its contract with WAPA by imputing post-construction interest on its general fund loan to the AVS project and charging that interest to WAPA.[22]  According to Norbeck, imputing interest in this manner violated the terms of the contract, as well as GAAP. Basin maintains that it did not breach the contract by billing WAPA for its share of imputed interest on the general fund loan.  Although Basin acknowledges that it computed the cost of borrowing from its general fund and charged WAPA its proportionate share, it maintains that its actions were within the four corners of the contract.  According to Basin, the contract only prohibited Basin from including imputed interest on its financial statements, which it did not do.

The district court did not determine whether Basin in fact charged WAPA for

---

[22]Norbeck brings this claim under the False Claims Act.  The Government supports his position in its briefs.

imputed interest or whether imputing interest violated the Basin-WAPA contract. Rather, it concluded that "whatever Basin Electric may have done or not done with interest on General Fund investment in AVS Unit II after it came on line, is justified in view of its structure" as a member cooperative. Basin, No. A1-95-003, slip op. at 20. Acknowledging its foray from the record, the court analogized Basin to an investor-owned utility and assumed that Basin's general fund was comprised of surplus dollars from Basin's business operations, which were to be refunded to the members based on their share of business with Basin.[23] See id. As such, the court reasoned that the general fund loan was not drawn from Basin's equity capital, but that it was more akin to a loan from Basin's members.

Basin financed much of the AVS project with borrowed funds that were guaranteed by the RUS. However, at some point during the construction period the relationship between Basin and RUS was disrupted by disagreement on a separate issue. RUS refused to guarantee further funds for the AVS project until the

---

[23]The district court's characterization of Basin's general fund differs somewhat from Basin's own characterization. When asked to describe Basin's general fund at trial, Shawn Deisz testified as follows:

> A good portion of those funds come from our membership. Members loan us money, per se, through what we call the member investment program. Basin Electric allows its members to lend money to Basin. We pay them a return on it, and because we are able to accumulate those dollars or those investments in a larger pot, the purpose of that is so that we can earn a higher rate of return for the members and they can get a better rate than going down to their bank and putting the money in. So they invest a large amount of money with us and that comprises a good portion of the general fund.

(Trial Tr. of Shawn Deisz at 117).

disagreement was resolved. Because it could not attain RUS-guaranteed funding, Basin borrowed from its own general fund to finance continued construction of the AVS project.

The parties do not dispute the legitimacy of Basin's general fund loan to the AVS project. What is disputed is the extent to which the Basin-WAPA contract allowed Basin to impute interest on this loan and include that interest as a cost of power to WAPA.[24]

Imputed interest is a term that takes on a variety of meanings, depending on the context in which it is used. In a general sense, imputed interest is an accounting fiction that describes the time value of money. In the instant case, imputed interest refers to the interest charges on Basin's general fund loan to the AVS project, which was an internal borrowing transaction. On Basin's books, the loan resulted in an interest charge to the AVS project and an interest income entry to the general fund. However, these bookkeeping entries did not result in actual interest payments, or cash inflows to and outflows from those accounts. Thus, the interest was imputed from one set of Basin's books to another, and not actually paid.

To understand the imputed interest issue presented in this case, it also is necessary to understand the RUS System, which is the organizing principle for determining costs under the Basin-WAPA contract. RUS is an agency of the United States Department of Agriculture that provides financing and technical assistance to

---

[24]The interest at issue is attributable to the AVS common facilities. WAPA purchased power from AVS II, which used a part of the common facilities to generate that power. Accordingly, interest charges from the common facilities were associated with producing power generated from AVS II and Basin included it as a cost of power under the Basin-WAPA contract. Interest on financing for AVS II is not at issue in this case because when Basin sold and leased it back, Basin's lease costs replaced the interest costs for that facility.

utilities in rural America. One of RUS's functions is to guarantee loans for rural electric cooperative projects. Central to RUS's loan-making process is its assessment and regulation of a cooperative's financial condition. For this reason, the RUS adopted the RUS System, which provides accounting methodologies and procedures so that the RUS accurately can assess "all of the dealings, business and affairs of the borrower." 7 C.F.R. § 1767.11. Although the RUS System is used to regulate and assess the financial viability of rural electric utilities, it does not purport to describe any method for utilities to bill purchasers. Nevertheless, the Basin-WAPA contract provided that each month Basin would determine its fixed costs for producing power from AVS II based on the summation of sixteen accounts from the RUS System.

The RUS System account at issue in this case is "427-Interest." The regulations provide that account 427 "shall include the amount of interest on outstanding long-term debt issued or assumed by the utility." 7 C.F.R. § 1767.23. The definition does not mention imputed interest on general funds and the parties have not pointed to any other part of the regulations that discusses or defines the term.

The experts who testified at trial agreed that imputed interest is a real and actual cost of getting an asset ready for service and an appropriate entry in account 427 during the construction period. When construction is finished, all interest costs (real or imputed, external or internal) incurred during the construction period are capitalized along with the other costs of construction and recovered from ratepayers through depreciation. From this point forward, interest is no longer capitalized but rather, is charged as an expense against operations and recovered through rates. The RUS System does not provide for imputed interest on a general fund loan after a facility becomes operational. In contrast, the parties seem to agree that interest on funds from third party lenders may be included in account 427 both during and after construction.

When presented with a question about internal borrowing, Roberta Purcell, Chief

of Technical Accounting and Auditing Staff at RUS, testified as follows:

> Q.  Is there any problem -- if you've got several divisions or projects or units within a cooperative, is there any problem with one of those divisions or projects borrowing money from the other and paying interest on that money?

> A.  There's no problem with that.  There's no restriction with that. That would be eliminated when you prepare Basin's books in total.

> Q.  And if there was -- truly was a loan that documented that relationship and that transaction, that wouldn't even be an imputed interest issue, would it, again as long as when you took the accounting for this division and this division and this division and put it together, you were not reflecting imputed interest?

> A.  If you had a separate set of books for each division and one division actually loaned money to another and you had a note that represented that, in effect that would not be imputed interest.  It would be interest for that particular division.  But, again, it would be eliminated out in the consolidation of the divisions.

(Trial Tr. of Roberta Purcell at 41-42).

Norbeck claims that Basin knowingly overstated the cost of power to WAPA by imputing interest on the general fund loan *after* AVS II went on-line.  According to Norbeck, imputing interest in this manner violated the RUS System specified in the contract, as well as GAAP.  Norbeck argues that imputed interest on general funds after the construction period does not fall under the RUS System's allowance for general funds used during the construction period and does not otherwise constitute interest on long-term debt under account 427.  As for Basin's violation of GAAP, Norbeck relies

on the premise that the Basin-WAPA contract was a cost contract.[25]   According to Norbeck, only historical costs can be assigned to a cost contract and imputed interest is not a historical cost under GAAP.  At the heart of Norbeck's argument is the notion that the general fund loan was not a loan at all.  Rather, when the construction bills came in for the AVS project, Basin simply paid them from its equity reserves.  Norbeck reasons that imputed interest was not the cost of borrowing funds in this case, but simply a mechanism for Basin to earn profit on equity capital it had in the bank.

In support of his position, Norbeck points to the terms of the Basin-WAPA contract, which adopt sixteen accounts from the RUS System for the purpose of determining the fixed cost component of power.[26]   By adopting these accounts, Norbeck contends that Basin also was contractually obligated to adhere to the requirements of the RUS System, including the prohibition on allocating imputing post-construction interest to account 427.  Specifically, Norbeck argues that because the contract, by virtue of adopting the RUS System, prohibits recording post-construction imputed interest in account 427, it also prohibits billing WAPA for post-construction imputed interest in account 427.

Norbeck insists that Purcell's testimony about internal borrowing was limited to a scenario involving an actual loan.  The distinguishing characteristic, according to Norbeck, is that actual loans generate actual interest.  In contrast, internal transfers such as the general fund loan in this case, involve imputed, or fictional, interest.  To prove the fictional nature of the transaction, Norbeck points out that there are no documents or other evidence to prove the legal existence of the general fund loan or its terms, such as a note or repayment schedule.  He also points to a Basin memo that

---

[25]The RUS System regulations define cost as "the amount of money actually paid for property or services."  7 C.F.R. § 1767.10.

[26]The cost of power under the contract also included "variable or energy related costs," for which a separate set of RUS System accounts were specified.

characterizes the general fund loan as non-cash "dummy payments." This leads Norbeck to conclude that the general fund loan and imputed interest are accounting fictions that should not have been recorded in account 427 or charged to WAPA under the contract.

Basin responds that its accounting for imputed interest fully complied with RUS's requirements. The RUS System allows for imputed interest under account 427 because that interest is a legitimate component of the asset's value. In contrast, post-construction imputed interest is not a component cost of the asset and cannot be capitalized. If post-construction imputed interest were included in a cooperative's financial statements, it would overestimate the financial strength of the cooperative and provide a faulty basis for the RUS's financing decisions. Basin explains that although it tracked imputed interest costs in account 427 both during and after construction, it did not compromise the integrity of the RUS System because that interest was eliminated on the company's consolidated books. The result, according to Basin, is that its financial statements accurately portrayed the value of the AVS facility in accordance with the requirements and goals of the RUS System.

Basin acknowledges that it would have been improper under the RUS System to *capitalize* account 427 imputed interest on the general fund loan after the construction period because doing so would inflate the value of the asset on Basin's financial statements. Thus, it did not capitalize these interest costs. It did, however, calculate the cost of borrowing from its general fund and allocate charges to account 427 for purposes of billing WAPA and other customers their share of those charges.[27]

_____

[27]In its initial brief on the issue, Basin suggests that its loan from the general fund is better characterized as a loan from its members. According to Basin, its general fund largely is comprised of funds its members invest through the membership investment program. The purpose of the program is for Basin to pool members' individual investments into a larger pot and earn a higher rate of return than what members otherwise would be able to earn by investing individually. Basin explains that it was

Basin explains that the cost of borrowing money to build the common facilities was associated with the cost of producing power from AVS II and therefore appropriately was billed to WAPA. Basin's position is that these interest charges are proper whether the source of funds is internal (Basin's general fund) or external (a third party lender).

Basin understands Purcell's testimony to mean that as long as post-construction imputed interest does not appear on its financial statements and is not capitalized, recording imputed interest in account 427 is allowed under the RUS System. Accordingly, Basin concludes that its methodology for computing interest on the general fund loan and charging WAPA its proportionate share, was entirely proper under the RUS System and by extension, the Basin-WAPA contract.

## B. Analysis

Despite the accounting principles and contract law that weigh heavily in the balance, the resolution of this issue must be based on the legal principles underpinning the False Claims Act. As explained in Part II, the False Clams Act prohibits any person from knowingly presenting a false or fraudulent claim for payment or approval by the federal government. See 31 U.S.C. § 3729(a)(1). A prima facie case under the statute requires that (1) the defendant made a claim against the United States; (2) the claim was false or fraudulent; and (3) the defendant knew the claim was false or fraudulent. Id.

The rules surrounding imputed interest and their application in the context of the Basin-WAPA contract are not as straightforward as the parties would have this court believe. As an initial matter, the Government, arguing on behalf of Norbeck, acknowledges that the RUS System does not prescribe a method for billing. This is an

entitled to calculate and charge interest on the general fund loan in order to ensure financial benefit to its members through the member investment program.

important consideration, given that the breach of contract alleged by Norbeck involves over-billing.

Equally troubling is Norbeck's reading of the regulations that purport to explain the proper implementation of the RUS System. Because post-construction imputed interest is not discussed in the regulations, Norbeck reasons that it is prohibited under 427 or any other account. This line of reasoning borrows from the legal maxim *expressio unius est exclusio alterius* (the expression of one thing excludes others not expressed) and we are not satisfied that it is appropriately applied in this case.[28] See Herman & MacLean v. Huddleston, 459 U.S. 375, 387 n.23 (1983) (rejecting application of the rule and embracing the idea that such canons "long have been subordinated to the doctrine that courts will construe the details of an act in conformity with its dominating general purpose.") (quoting Securities and Exch. Comm'n v. C. M. Joiner Leasing Corp., 320 U.S. 344, 350-51 (1943)); Bailey v. Federal Intermediate Credit Bank of St. Louis, 788 F.2d 498, 500 (8th Cir. 1986) (noting that "[t]he applicability of 'expressio unius' depends upon the intent of the drafters of a statute, and the maxim should be invoked only when other aids to interpretation suggest that the language at issue was meant to be exclusive."). Nothing in the regulations suggests that Basin's inclusion of post-construction interest for the purpose of billing AVS participants their proportionate share of that cost runs afoul of the RUS System. At minimum, we find that the regulations that govern RUS account 427 do not contain a mandatory exclusion of post-construction imputed interest for purposes of billing. See United States ex rel. Oliver v. Parsons Co., 195 F.3d 457, 463 (9th Cir. 1999) (noting

---

[28]The Government broadly asserts that "the RUS Uniform System of Accounts quite clearly prohibits even recording imputed interest as a cost in Account 427, regardless of its effect on the financial statements." (Letter Br. for Govt. at 3). This prohibition is anything but clear. Although experts testified that imputed interest on general funds is allowed during construction but disallowed once a facility becomes operational, we find no place in the regulations that explicitly prohibits imputed interest from being recorded in account 427.

-34-

that where the issue is whether accounting practices complied with the federal Cost Accounting Standards there is a difference between regulations that are mandatory and those that are discretionary).

Based on the evidence in the record, we find that the transaction between Basin's general fund and the AVS project fits into the scenario presented to Purcell. Although it may not have been a separate unit or division of the company, the AVS project certainly was a "project" that was accounted for in a separate set of books. A schedule of repayment for the general fund loan to the project was recorded on a master amortization schedule along with other AVS debt. Despite that the source of the funds at issue was Basin's internal fund, rather than a third party lender, the transaction was nevertheless a loan. The regulations do not define what constitutes a loan under the RUS System. Courts have defined "loan" in a variety of contexts. After reviewing well-settled definitions of the term in other circuits, this court has stated that where one party advances money to another, who in turn agrees to repay the loan with interest, there is a loan. See United States Dept. of Health and Human Servs. v. Smith, 807 F.2d 122, 124-25 (8th Cir. 1986). In this case, Basin's general fund advanced money to the AVS project. The amortization spread sheet indicates that the AVS participants were to repay the advance, with interest. This evidence is sufficient to have created a loan. When the accounting for the general fund and the AVS project were combined in Basin's consolidated books, no imputed interest was reflected. According to Purcell's testimony, this transaction does not create an imputed interest situation in the eyes of RUS.

If we view the transaction outside the strict confines of the RUS System, the ultimate resolution of the issue becomes more clear. Basin financed the construction of the AVS facility with loans from various sources, both external and internal. There is a cost of borrowing associated with such loans. The parties agree that there is no prohibition in the RUS System or otherwise in the contract that prohibited Basin from charging WAPA its proportionate share of interest expenses on a third party loan.

Given our analysis of the general fund loan in this case, nothing in the contract prohibits Basin from charging WAPA its proportionate share of interest on the general fund loan.

A contract is to be interpreted in light of the totality of the circumstances that surrounded its formation, and the principal purpose of the parties is given great weight. See Restatement (Second) of Contracts § 202(1). To interpret the words and conduct of the parties to a contract, we must put ourselves in the position of Basin and WAPA at the time the contract was made. See id., at cmt. b. The Basin-WAPA contract was a cost contract. In other words, the contract provided that Basin would charge WAPA for the cost of producing the power WAPA purchased from AVS II. At the onset of the AVS project, and when the parties signed the Basin-WAPA contract, Basin anticipated that construction would be funded by loans from outside investors. It was not until 1983 that Basin had to borrow from its own general fund to finance construction of the AVS facility. Thus, at the time Basin and WAPA negotiated the contract, we must assume that WAPA understood its cost of power would include interest on the loans used to finance construction. We decline to interpret the contract in such a way that would reward WAPA, and Norbeck by extension, for an unanticipated course of events that shifted the source of money used to construct the AVS facility.

The question of whether Basin breached the Basin-WAPA contract is relevant, but not a conclusive factor in the analysis of Norbeck's False Claims Act claim. As we have noted, a breach of contract alone does not constitute a false claim for payment. See Butler, 71 F.3d at 329. Therefore, even if we were to find that Basin breached the contract by virtue of post-construction imputed interest charges, Norbeck must still satisfy the third element of his case: that Basin knew the claim was false or fraudulent.

Knowledge under the False Claims Act is civil in nature and a showing of specific intent to defraud is not required. See 31 U.S.C. § 3729(b). However, a

Relator must, at a minimum, prove that the defendant acted with deliberate ignorance or reckless disregard for the truth or falsity of the information. See id. Our analysis of the Basin-WAPA contract and the RUS System, in light of the facts of this case, led us to conclude that Basin's interpretation and performance under the contract was reasonable. See Oliver, 195 F.3d at 463 (explaining that the reasonableness of a defendant's interpretation of those standards are relevant to whether the defendant knowingly submitted a false claim). We find that Norbeck's claim under the False Claims Act fails because he did not prove that Basin acted with the requisite knowledge. Accordingly, we affirm the district court's dismissal of Norbeck's imputed interest claim.

## PART V.  COAL OVERCHARGE

On cross-appeal, the Government claims that Basin breached its contract with WAPA by overcharging WAPA for the cost of coal burned in AVS II. Under the Basin-WAPA contract, the cost of coal was a component part of the overall price of power. Basin would determine the cost of coal burned in AVS II, calculate WAPA's proportionate share, and plug that amount into the pricing formula used to calculate WAPA's monthly bill.

A number of factors went into Basin's determination of its coal costs. At issue in this case is a discount Basin received on the coal it purchased from the ANG Coal Gasification Company ("ANG") and a per ton amortization charge Basin included as a cost of power to help cover the expenses it incurred to finance the Freedom Mine.[29] The Government's claim for breach is twofold:  first, that Basin failed to include the

---

[29]The supply chain of coal to AVS II was multi-faceted. For purposes of this case, the Freedom Mine sat at the beginning of the chain. The coal then traveled through the Dakota Coal Company, which was a subsidiary of Basin. Next the coal moved to the nearby gasification plant. Finally, ANG delivered the coal to the AVS facility where it was burned by AVS I and AVS II.

full benefit of the coal quantity discount when it determined the cost of coal burned in AVS II; and second, that the spreadsheet Basin used to calculate the Freedom Mine amortization charge was fundamentally flawed such that WAPA was charged more than its share for the Freedom Mine expenses.

The district court found for Basin on both claims.

## A. Coal Quantity Discount

### 1. Background

Basin and ANG had a dual contractual relationship whereby each bought from and sold to the other. Basin purchased coal for AVS I and AVS II from ANG pursuant to a Joint Coal Supply Agreement ("JCSA"). Under the JCSA, ANG sold the coal to Basin at a discount equal to approximately fifty-eight cents per ton of coal burned in AVS II.[30] See JCSA ¶ 5.6(a)(1). A related Power Supply Agreement ("PSA") between

---

[30]ANG discounted the coal because Basin agreed to purchase "coal fines" (the smaller pieces of screened coal with a lower BTU content), which allowed ANG to use the larger pieces of coal with the higher energy value at the gasification plant. In exchange for buying the lower grade coal, Basin wanted ANG to cover a royalty charge Basin paid on each ton of coal it purchased from ANG. According to the trial testimony of Mark Foss, Basin's general counsel, the parties came to a "classic compromise:" ANG would pay half of the override that Basin otherwise would have to pay on the coal it purchased from ANG.

Foss testified that to arrive at half the override, the discount could have been based on the amount of coal burned in AVS I, the amount of coal burned in AVS II, or half the amount of coal burned in AVS I and II together. Ultimately, the discount was structured to provide Basin with an incentive to get AVS II on-line as soon as possible. ANG stood to benefit if the discount was based on the coal burned on AVS II because the PSA provided that once AVS II went on-line, ANG would pay a lower rate for the power it purchased from Basin. Basin, in turn, had an incentive to complete AVS II

Basin and ANG provided that ANG would purchase power from Basin at a rate that included the coal quantity discount defined in the JCSA. Although under the JCSA Basin's discount was based on the amount of coal burned in AVS II, the PSA provided that "[f]or Unit 1 and Unit 2 . . . Fuel and Fuel Related Costs shall also include the full benefit of the quantity discount" in the JCSA. PSA, Art. I.

The coal burned in AVS II was a "variable or energy related cost[]" under the Basin-WAPA contract. Since the coal quantity discount defined in the JCSA was based on the amount of coal burned in AVS II, the Government reasons that the entire discount should have been subtracted from the cost of coal burned in that facility. Had Basin allocated the discount in this way, WAPA would have benefitted by paying a lower price for power from AVS II. Instead, Basin diluted the discount by subtracting it from the cost of coal for the entire AVS project, which included AVS I. Because the coal quantity discount was based on the amount of coal burned in AVS II, and cost-based contractors like Basin may not elect to retain the benefits of rebates or discounts that they obtain as a result of purchases made to fulfill the contract, the Government argues that Basin breached the contract by failing to pass on the entire discount to WAPA.

The Government rejects as irrelevant the PSA's treatment of the coal quantity discount. As an initial matter, the Government argues that the JCSA and the PSA are

_____

because the coal quantity discount was to take effect once that facility started burning coal.

ANG applied the discount to Basin's monthly coal bill. For example, ANG's invoice to Basin for July 1986 lists the total amount of coal delivered to the AVS facility, "Less: Quantity discount for coal consumed by Unit II." Thus, although the discount was measured by the amount of coal burned in AVS II, the bill combined the total amount of coal delivered to AVS I and II.

two separate agreements dealing with different subject matters: the former deals with coal and the latter deals with power. Moreover, the JCSA contains an integration clause, which states that the JCSA "supersedes all prior agreements and understandings of the parties with respect to the transactions contemplated hereby," and that "the parties shall look only to this Joint Coal Supply Agreement for the rights and obligations of the parties with respect to each other related to the subject matter hereof." JCSA § 12.12. According to the Government, this clause precludes the possibility that the proper application of the coal quantity discount is contained in the PSA.

Finally, the Government argues that even if the PSA and the JCSA properly were interpreted together, their plain language limits the discount to the coal burned in AVS II. The PSA defines the coal quantity discount according to "Section 5.6 of the [JCSA]." PSA, Art. I. The parties agree that paragraph 5.6(a)(i) of the JCSA applies, which by its terms confines the discount to coal "consumed by Unit 2." JCSA ¶ 5.6(a)(i). In contrast, paragraph 5.6(a)(ii), which does not apply in this case,[31] defines the discount in terms of coal "consumed by Unit 1 or Unit 2." JCSA ¶ 5.6(a)(ii). The Government reasons that because (a)(i) was invoked during the performance of the contract, the discount in fact was limited to the amount of coal burned in AVS II.

Basin responds that the coal quantity discount is better described as a downward price adjustment that reflects the lower grade coal it purchased for the AVS facility. Since AVS I and AVS II equally shared the burden of burning the lower grade coal, both units properly shared in the discount. In support of this argument, Basin contends that its physical management, inventory and accounting system, and contractual arrangement for purchasing the coal all show that the discount, or the reduced price, properly was applied to the entire AVS facility.

---

[31]Paragraph 5.6(a)(ii) was only triggered by the meeting of a contingency, which was specified in paragraph 4.3(a)(ii) of the JCSA, but did not occur.

Basin first explains that it applied the discount according to the physical allocation of the coal fines purchased from ANG. For purposes of its contract with ANG, Basin could, and did, calculate the amount of coal burned in AVS II, which then was used as the basis for the discount on its total monthly coal purchase. In reality, however, Basin maintained only "one big coal pile" to supply all of its plants, which was never in fact segregated into separate fuel supplies for AVS I and AVS II.

Second, for its own accounting and inventory purposes, Basin used the weighted average cost methodology, which is the industry standard for treating coal inventory. An expert for Basin testified at trial that it would be inconsistent with the weighted average cost system to apply the coal quantity discount to AVS II but not to AVS I. If the discount were to be allocated only to AVS II, customers who purchased power from AVS I would pay a higher rate than customers who purchased power from AVS II. Basin reasons that such a result would be unreasonable because both AVS I and AVS II burned the lower grade coal.

Finally, Basin contends that the JCSA and the PSA are integrated agreements that must be read in pari materia to reach the correct construction and application of the coal quantity discount. Basin interprets these agreements together to mean that the discount was to be measured on the tonnage burned in AVS II, but apportioned between both units.

The district court held that there was no breach of contract with respect to the manner in which Basin applied the coal quantity. We agree.

### 2. Analysis

It is true, as the Government points out, that cost-based contractors are prohibited from charging more than what is "reasonable and proper" and must limit the costs they pass through to those that are "actually paid." See Jensen v. Manthe, 95

N.W.2d 699, 703 (Neb. 1959). This means that the contractor must credit the buyer with discounts and credits unless the contract provides otherwise. See LaPuzza v. Prom Town House Motor Inn, Inc., 217 N.W.2d 472, 477 (Neb. 1974). However, in this case we are not asked to decide whether Basin did or did not credit WAPA with the discount it received from ANG. Rather, the question before us is whether the manner in which it apportioned that discount was proper. For the answer, we look to the terms of the contract itself.

The Basin-WAPA contract provides that at the end of each month Basin shall determine its "fixed" and "variable or energy related costs associated with the appropriate unit." Basin-WAPA contract at Ex. A, ¶ 3, 4. Coal is listed as a variable or energy related cost under the contract. Thus, we must determine whether Basin properly calculated its cost of coal for AVS II. As evidenced by the parties' arguments, Basin's cost of coal is not a black and white term in this case. When two good arguments can be made for either of two contrary positions as to the meaning of a contract provision, an ambiguity exists. See Home Ins. Co. v. Aetna Ins. Co., 236 F.3d 927, 929 (8th Cir. 2001). Whether a contract is ambiguous is a question of law subject to de novo review. See Nebraska Pub. Power Dist. v. MidAmerican Energy Co., 234 F.3d 1032, 1040 (8th Cir. 2000). When a contract is ambiguous, the court looks to extrinsic evidence, such as the nature and the subject matter of the contract and the facts and circumstances surrounding its negotiation, to discern how the parties intended to define the contract terms. See AgGrow Oils, L.L.C. v. National Union Fire Ins. Co. of Pittsburgh, PA, -- F.3d --, No. 99-4319, 2001 WL 219144, at *2 (8th Cir. Mar. 7, 2001).

Basin entered into its contract with WAPA two years after it executed the JCSA and PSA with ANG. Based on this chronology, when Basin contracted to sell power to WAPA, its understanding of the cost to produce power was based, in part, on its contractual arrangement to purchase coal from ANG. Therefore, we look to the JCSA, which contains the coal quantity discount, as extrinsic evidence to ascertain the

-42-

meaning of Basin's cost of coal for AVS II.

Basin and ANG executed the JCSA and the PSA on the same day. Although the JCSA deals with coal and the PSA deals with power, the context in which they were negotiated reveals that these contracts were closely linked and were component parts of a larger transaction. When two instruments are executed at the same time, by the same parties, in the course of the same transaction, and cover the same subject matter, they will be construed together. See Jorgensen v. Crow, 466 N.W.2d 120, 123 (N.D. 1991). Further evidence of the connection between these contracts is found in the plain language of the PSA, which expressly cites paragraph 5.6 of the JCSA. See Lakeland Realty Co. of Minn. v. Reese, 46 N.W.2d 696, 700 (N.D. 1951) (noting that instruments may be construed together where they reference and supplement each other). The integration clause flagged by the Government does not prohibit our examination of the PSA to understand the meaning of the coal quantity discount as defined in the JCSA. It is well-established that a statement in a contract that it is integrated is not conclusive, but only a factor to be considered. See Restatement (Second) of Contracts, § 209 cmt. b (1981). The surrounding circumstances pointing to the interrelatedness of the JSCA and the PSA override the possibility that Basin and ANG intended one to be read to the exclusion of the other.

Paragraph 5.6 of the JCSA provides that ANG is to credit Basin with a discount equal to approximately fifty-eight cents per ton of coal consumed by AVS II. See JCSA ¶ 5.6(a)(i). The PSA sets forth the proper application of the coal quantity discount: "For Unit 1 and Unit 2 of the Generating Plant only, Fuel and Fuel Related Costs shall also include the full benefit of the quantity discount on fines provided for in Section 5.6 of the Joint Coal Supply Agreement between the parties." PSA, Art. I. This means that when it contracted to sell power from AVS II to WAPA, Basin understood that its cost of coal for the entire AVS facility was reduced by the coal quantity discount.

Course of performance also is relevant to explaining ambiguous contract terms. See Restatement (Second) of Contracts, § 5 cmt. a. ANG did not separately bill Basin according to the coal burned in AVS I and AVS II. Rather, ANG calculated the total amount of coal it delivered to the AVS facility and subtracted from that the discount based on the coal burned in AVS II. ANG's billing method also comports with the industry standard weighted average cost system used by Basin to track the coal supply for the entire AVS facility. Thus, ANG's invoices to Basin offer further proof that although the coal quantity discount was measured by the amount of coal consumed in AVS II, it was in fact allocated to the coal purchased for the entire AVS facility.

With this background in mind, we find that when it entered into its contact with WAPA, Basin intended that its cost of coal for AVS II include a proportionate share of the coal quantity discount. Although the Government argues for a different result, there is no evidence in the record to show that the parties understood Basin's cost of coal would be calculated in a different manner. For these reasons, we affirm the district court's finding that Basin did not breach its contract with WAPA by virtue of the manner in which it credited WAPA with the coal quantity discount.

## B. Freedom Mine

### 1. Background

The second part of the Government's cross-appeal on the coal pricing issue relates to Basin's alleged overcharges to WAPA based on the Freedom Mine amortization rate, which was a component of the price WAPA paid for power under the Basin-WAPA contract.

The Freedom Mine provided coal for the production of power from the AVS facility. Basin was contractually obligated to fund a portion of Freedom Mine

development and future reclamation costs.[32]  Basin's Freedom Mine related costs were twofold:  it directly financed a portion of mine development and it also made interest-free loans to the Coteau Properties Company ("Coteau"), which operated the mine.  Basin estimated total expenditures and loans based on engineering reports that projected Coteau's estimated financial needs over a certain period of time.

Basin amortized its Freedom Mine development costs (direct expenditures and imputed interest on loans) and recovered those costs through a per ton charge levied on the coal burned at the AVS facility.  This charge was factored into the price of power paid by AVS II participants, including WAPA.

Basin calculated its per-ton amortization rate using five factors:  (a) the amortization period; (b) the coal tonnage; (c) Coteau's principal payments; (d) additional expenditures; and (e) the interest rate for imputing interest.  A Basin bookkeeper plugged the information into a spreadsheet and adjusted the rate until it "zeroed out" at the end of the amortization period.  The result would serve as the amortization rate for the year.  Basin re-calculated the amortization rate at the beginning of each year, annually adjusting each factor in the equation according to the "best available information" at the time.[33]

---

[32]Basin shared this obligation with ANG, which operated the nearby gasification plant. Basin's estimated obligation constituted approximately fifty-three percent of the Freedom Mine costs and ANG was to fund the difference of forty-seven percent.

[33]On at least three occasions Basin recalculated its amortization rate mid-year when it received more accurate data.  In March 1986, Basin reduced the rate from $2.2465 per ton to $1.9487 per ton, and made the change in its fuel register retroactive to January 1986.  In March 1988, Basin again reduced the rate from $.7942 per ton to $.7650 per ton, and made the adjustment effective as of January 1988.   Then in June 1990, Basin increased the rate from $.8233 to $.8945 and made the change retroactive to January 1990.

The Government does not complain about Basin's formula for calculating the amortization rate.  Rather, the Government claims that Basin made fundamental errors in the 1986 and 1987 spreadsheets with regard to the variables representing the amortization period and additional expenditures.

The district court found that the spreadsheets computing the Freedom Mine amortization rate for 1986 and 1987 "[did not] add up" and included costs for advances from Basin to Coteau, "which were in fact never made." Basin, No. 90-345, slip op. at 14.  The result, according to the district court, is that when the numbers are viewed in retrospect, they "appear to have little relationship with reality." Id. at 15.  Although the court determined that the errors were caused by inaccurate estimates and faulty assumptions, it found that such errors did not require Basin to make retroactive adjustments.  Under applicable accounting standards, estimated advances need not be retroactively corrected as long as such estimates were made in accord with the best available information at the time and modified in subsequent years to reflect any changes based on new information.   Ultimately, the court concluded that the Government did not carry its burden of proving that Basin overcharged WAPA via the Freedom Mine deferral.

2. Analysis

The elements of a prima facie case for breach of contract are (1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach. See Moorhead Const. Co. v. City of Grand Forks, 508 F.2d 1008, 1015 n.10 (8th Cir. 1975).  The plaintiff bears the burden of proving each element.

The price WAPA paid for power under the Basin-WAPA contract was based on the cost of production.  The cost calculation methodology set forth in the contract was based on the fixed and variable or energy related cost of producing power. Accordingly, to prevail in its breach of contract claim against Basin, the Government

must show first, that WAPA's share of the Freedom Mine amortization rate did not represent a true cost of producing the power it purchased and second, that the miscalculated rate resulted in an overcharge to WAPA.

### a. Amortization Period

Basin's amortization spreadsheet originally was structured for a thirty-two year amortization period to correspond to the term of its contractual obligation to finance the Freedom Mine. The Government complains that the 1986 amortization schedule for the Freedom Mine was only completed through the first nineteen years, which increased the annual amortization rate from what it would have been if it were carried through for the entire thirty-two year term. By increasing the annual amortization rate in this way, the Government complains that WAPA was unfairly burdened with paying more of the rate than it would have if a thirty-two year schedule were used.[34] The district court did not make any specific findings on this issue.

Although the Government complains that Basin's switch from thirty-two to nineteen years unfairly shifted the financial burden of the Freedom Mine deferral to WAPA, it does not explain how that change amounts to a breach of contract by Basin. The Government also fails to explain how this switch constituted a material calculation error that Basin was required to retroactively adjust under GAAP.

We find no breach of contract with regard to Basin's change of the amortization period. The record shows that Basin had a legitimate reason for changing the amortization period. In 1988, ANG failed and was being operated by the Department of Energy, which wanted to sell it. In 1988, Basin acquired the assets of ANG from the Government. The acquisition plan called for Basin to form a subsidiary, Dakota Coal

---

[34]The 1987 spreadsheet was calculated over a thirty-three year amortization period, although subsequent spreadsheets used a nineteen year period.

Company, which would acquire the assets and liabilities of ANG, as well as Basin's obligations to finance the Freedom Mine. As a result, on November 19, 1988, the obligation to advance funds to Coteau was transferred from Basin and ANG to the Dakota Coal Company.

Basin made its final loan to Coteau in 1988, which Coteau was to repay through March 2003. Basin then revised its amortization schedule so that the Freedom Mine amortization period would correspond with expiration of its last loan to Coteau.

Since the majority of the Freedom Mine amortization rate was based on imputed interest on Coteau's final note to Basin, we agree with Basin that it was reasonable to link the amortization period to the date when the final payment on that note was due. In any event, the Government has failed to prove any breach of contract with regard to the change in the amortization term.

### b. Additional Expenditures

The Government's allegations that Basin erred with regard to the additional expenditures column of the Freedom Mine amortization spreadsheet are two-fold.[35]

_____

[35]At trial, Deisz acknowledged the lack of information about what comprised the "additional expenditures" column:

> What I don't know and was not able to find out was for the column of additional expenditures it says expenditures. It doesn't say additional advances on the note. It says additional expenditures. If, in fact, those expenditures were not all advances, future advances on the note, but, in fact, expenditures that Basin Electric was going to incur and collect through the amortization of the rate, there's no error. It's right. I don't know if the additional expenditures are all advances or if, in fact, they include

First, the Government claims that the amortization spreadsheets projected more money going *to* Coteau in loans than was to be received *from* Coteau in repayments. Although the loans to Coteau were interest free, with imputed interest to be paid by AVS participants, Coteau was responsible for repaying the principal. Second, the Government claims that Basin imputed interest on additional advances that were not in fact made.

In 1986 Coteau's outstanding note balance was $41,712,484. Basin's amortization spreadsheet for that same year forecast additional expenditures in the amount of $12,629,190. If the additional expenditures figure represents an interest-free loan, rather than a direct expenditure by Basin, Coteau's total projected indebtedness to Basin as of 1986 was $54,341,674. However, the Coteau note *payments* calculated on the 1986 spreadsheet only amounted to $45,779,178, leaving a discrepancy of $8,562,496. According to the Government, Basin made up the difference between Coteau's note principal and repayments by increasing the amortization rate. The Government concludes that WAPA's share of the 1986 amortization rate wrongly included note principal.

A similar discrepancy is evidenced on Basin's 1987 spreadsheet. In that year,

_____

other expenditures.

\* \* \* \*

> Nobody who was around could recall how that additional expenditure played into the deferral and how it was supposed to be part of new advances or part of additional expenditures or what it was a part of it. There wasn't anybody around anymore that had done that back in those years.

(Trial Tr. of Shawn Deisz at 71, 172).

Coteau's note balance was $41,408,362 and the projected additional expenditures totaled $81,045,715. Again, assuming the additional expenditures column represents loans that were to be repaid, Coteau's total projected indebtedness to Basin as of 1987 amounted to $122,454,077. Coteau's projected payments on the same spreadsheet only totaled $64,687,180, leaving a discrepancy of $57,766,897. According to the Government, this $58 million also was amortized through the per-ton rate, rather than calculated into Coteau's payments, resulting in an overcharge to WAPA in 1987.

Basin responds that the Government cannot bear its burden of proving breach on this theory because of the unavailability of complete source documentation relating to the Freedom Mine amortization calculations, which were made more than a decade before this issue was brought to trial. The only available witness was the bookkeeper who simply plugged the numbers into the spreadsheet. No other witnesses who were involved in the development of the amortization formula or the numbers that went into it were available to testify. Moreover, many of Basin's records for 1986 and 1987 have either been lost or destroyed in the course of business. However, based on the information that is currently available about those years, a Basin executive explained that there were in fact plausible explanations for the figures that were used to calculate the amortization rate. Basin concludes that the Government's bold assertion of breach cannot stand on the piecemeal evidence it presented at trial.

The Government's second charge of breach regarding additional expenditures is that the amortization spreadsheets for 1986 and 1987 included advances to Coteau that were in fact never made. According to the Government, these so-called "phantom advances" increased the amortization rate and in turn, increased the price Basin charged WAPA for power. Despite accounting principles that generally require prospective, not retroactive, adjustments to balance sheets, the Government maintains that Basin contractually was obligated to credit WAPA for the overcharge once it realized that the projected advances were not in fact made to Coteau.

In support of its argument, the Government points to the terms of the Basin-WAPA contract. Although the contract stated that Basin would "submit an estimated monthly bill to the United States within fifteen (15) days after the end of the month," it also provided that "[m]onthly adjustments [would] be made to correct for differences between estimated and actual bills." WAPA-Basin contract at ¶ 9(i). The Government argues that this provision in the contract supersedes any accounting principle that might otherwise suggest retroactive adjustments are not required. However, the Government points out that in this case GAAP actually required Basin to credit WAPA for the overcharge. Under GAAP, material errors such as the one promulgated by the phantom advances must be made on a retroactive basis. Thus, the Government concludes that Basin breached the contract by virtue of the phantom advances whether the issue is analyzed under the strict terms of the contract or under GAAP.

Basin responds that its amortization schedules necessarily and permissibly were based on Coteau's estimated and projected needs for the Freedom Mine. To support its argument that the methodology for estimating and updating the annual Freedom Mine amortization rate comported with GAAP, Basin points to the conclusion of the outside audit performed by Coopers. After reviewing Basin's amortization methodologies, data and calculations, Coopers concluded that Basin's procedures with respect to the Freedom Mine amortization rate were both "reasonable and proper." Basin also explains that the experts who testified at trial all agreed that it was proper for Basin to base estimated additional expenditures to Coteau on the "best available information" at the time the estimates were made and that GAAP requires prospective adjustments to be made as the "best available information" changes.[36] Under GAAP,

_____

[36]However, the Government's experts testified that the skewed numbers produced by the spreadsheets should have raised a red flag to Basin and that Basin should have acted to correct the errors. For instance, Ned Christiansen, an accountant with KPMG, testified on cross-examination that "[t]he 1986 advance of twelve million dollars wasn't really hindsight for them. When they were preparing 1987, they would have known that twelve million dollars hadn't been advanced, and that should have

retroactive adjustments are reserved only for material error. Thus, under-estimates or over-estimates in an amortization calculation only should be changed prospectively when annual adjustments to the rate are made.

The district court was correct that the spreadsheets for 1986 and 1987 do not add up in the sense that they reflect more going to Coteau than collected from Coteau over the course of the amortization period.[37] Basin does not attempt to justify the discrepancy under any accounting or legal principle. Rather, it focuses on how the additional expenditures column in the spreadsheets necessarily was based on estimates and calculated using the best available information at the time.

However, this reasoning does not explain why the spreadsheets forecasted more being paid to Coteau than collected from it over the life of the amortization period. The Freedom Mine amortization rate was to include Basin's direct expenditures on the mine and imputed interest on advances to Coteau. Principal on advances was not a legitimate component of the rate. Despite the admittedly sparse evidence the Government set forth

_____

triggered somebody to . . . evaluate these advances." (Trial Tr. of Ned Christiansen at 118). Christiansen went on to explain that as time went on Basin did a better job of analyzing the future and preparing the amortization schedule.

[37]The Government points out that despite confusion in the evidence as to whether the additional expenditures constituted direct expenditures by Basin (which Coteau was not obligated to repay) or additional advances (upon which Coteau was obligated to repay principal, but not interest), the district court made a finding of fact that the money reflected on the spreadsheets were *advances*. See Basin, No. A1-95-003, slip op. at 14-15. The only evidence to the contrary that Basin presented at trial was speculation by a Basin executive who asserted that there were "plausible" explanations for the numbers. Basin does not seek to clarify the issue on appeal and refers to the additional expenditures column as "advances" in its briefs. For this reason, we find that the additional expenditures column constituted additional advances on the loan, with principal to be repaid by Coteau and imputed interest to be recovered through AVS participants.

at trial to support its claim, when weighed against Basin's response that there are "plausible explanations" for the Freedom Mine figures, the claim deserves attention.

According to the calculations and spreadsheets introduced at trial, the rate included principal. Moreover, under GAAP these erroneous calculations constitute a material error that must be retroactively corrected. Our concern is not with the accounting resolution of Basin's books, however. Our focus is whether the errors warranted a refund to WAPA. Basin acknowledges that it did not retroactively adjust the Freedom Mine amortization rate for preceding years, or credit WAPA for the overcharge on a prospective basis. Thus, insofar as the amortization rate included principal on advances to Coteau, Basin breached the contract.

Upon review of the record it is also clear that Basin included advances in the 1986 and 1987 spreadsheet that were not in fact made. It is true that under GAAP, as long as Basin's projected additional expenditures on the Freedom Mine were based on the best available information at the time, it was not required to make retroactive adjustments. It is also true that Coopers audited Basin's financial statements with regard to the Freedom Mine amortization rate and found that Basin's methodology was "reasonable and proper." But the question of whether Basin overcharged WAPA under the contract is not solved by accounting principles. Rather, the terms of the contract govern what was and was not an appropriate component of the cost WAPA paid for power.[38] Accordingly, we find that Basin also breached the contract with respect to the

_____

[38]We find the Government's argument based on paragraph 9(i) of the Basin-WAPA contract to be unpersuasive. Although the provision states that Basin would submit to WAPA an estimated monthly bill, which thereafter would be adjusted to reflect the actual bill, Basin argues that the intent and purpose of this provision was to adjust WAPA's bills according to WAPA's actual consumption of power, not Basin's actual cost of producing that power. This is a reasonable interpretation if it is true that WAPA's power consumption readily was determinable on a monthly basis, while the actual cost of producing that power was not. For instance, the Freedom Mine deferral rate, which factored into Basin's cost of producing WAPA's power, was calculated on

advances in the 1986 and 1987 spreadsheets which were not in fact made.

This finding of breach, however, does not necessarily mean that the Government will be successful on its Freedom Mine claim, as its claim is inextricably intertwined with it proving any damages it suffered as a result of the breach. Accordingly, we reverse and remand this claim to the district court for a determination of damages, if any.

## PART VI. CONCLUSION

In conclusion, the resolution of this case on appeal is as follows. First, on the issue of the sale/leaseback of AVS II appealed by Basin, we find that the district court erred in determining that Basin overcharged WAPA more than the $2.4 million it refunded prior to this litigation. We also find that the district court erred in determining that Basin submitted the $2.4 million in overcharges with the intent necessary for a False Claims Act violation. We therefore reverse the district court's judgment for Norbeck under the False Claims Act. Second, on Basin's appeal of the 10/20 amortization issue, we find that the district court erred when it found that Basin breached its contract with WAPA by choosing a ten-year amortization period. In view of our holding that Basin did not breach its contract with WAPA by choosing a ten year amortization period, Norbeck's claim of fraud on this issue, which the district court dismissed, is no longer a viable claim and is ordered dismissed. Third, on the issue of imputed interest cross-appealed by Norbeck, we affirm the district court's dismissal of this claim. Finally, on the Government's cross-appeal of the coal pricing issue, we affirm in part, and reverse and remand in part. We affirm the district court's finding that Basin did not breach its contract with WAPA by virtue of the manner in which it apportioned the coal quantity discount. However, we reverse the district court's finding with regard to the Freedom

an annual basis, which would have rendered the contract's monthly adjustment provision meaningless in terms of that variable. For this reason, the contract provision relied on by the Government does not support its argument.

Mine amortization rate.  Therefore, we reverse and remand the Freedom Mine issue to the district court for a determination of damages, if any.  On Norbeck's False Claims Act claims that are reversed and the Government's claim involving the coal quantity discount, we remand to the district court with directions that these claims be dismissed with prejudice.

BEAM, Circuit Judge, concurring.

I concur in the result only.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.